NATHAN KRONMAN & COMPANY, Plaintiff, *v.* THE TEXAS TRANSPORT AND TERMINAL COMPANY, Appellant.

(Supreme Court, Appellate Term, First Department, November Term — Filed December, 1921.)

**Ships and shipping — contracts — carriers — wharfage — agreement by consignee to pay pro rata charge for heated pier enforced.**

Plaintiff was the consignee of more than 6,000 cases of onions which were expected to arrive in New York on or about February 24, 1920, on a steamship operated by defendant. In anticipation of the arrival of the vessel, plaintiff, with other consignees of similar goods, being desirous that the cargo should be unloaded at a heated wharf, where there would be no danger of the cold weather injuring the onions, signed a writing addressed to defendant by which, in consideration of its engaging a certain heated pier for the discharge of the cargo of onions, the consignees agreed, in the event that the vessel did not dock on or before February 24, 1920, to pay the defendant the sum of $330 per day as the cost of said pier up to the date of her docking, upon condition that whenever the vessel docked the charges to the consignee for wharfage should commence forty-eight hours after the termination of the discharge of the cargo. The ship did not arrive until three days after said February twenty-fourth and after the cargo had been discharged defendant sent to plaintiff a check for $442.36 with a statement showing that plaintiff had been charged for wharfage and other expenses the difference between the amount of said check and the amount of plaintiff's "wharfage deposit" which it had made under protest. The plaintiff refused to

accept the check and brought this action to recover the full amount of the deposit. *Held,* that though defendant was not bound to provide a heated wharf, it had a right to contract to furnish such a one for additional compensation and that plaintiff having acted upon the agreement was bound by its terms.

A contention that the agreement was unenforcible as against public policy on the ground that defendant in any event was bound to furnish a proper place for the landing of the cargo and had no right to demand extra payments to enable it to comply with its own obligation, was untenable.

Plaintiff's obligation, under the contract, being limited to its *pro rata* share of $330 per day from February twenty-fourth to the date of the arrival of the vessel, the judgment in favor of plaintiff for the full amount of the wharfage deposit was erroneous, and will be reversed unless plaintiff stipulates to reduce the judgment by its *pro rata* share of $990, in which event the judgment as modified will be affirmed, without costs to either party.

APPEAL by the defendant from a judgment of the Municipal Court of the city of New York, borough of Manhattan, first district, entered in favor of the plaintiff, after a trial before the court without a jury.

William Hayward, United States Attorney (Francis A. McGurk, Assistant United States Attorney, of counsel), for appellant.

Joffe & Joffe (Joseph Joffe, of counsel), for respondent.

LEHMAN, J.   The defendant corporation operated in February, 1920, a steamship for the United States Shipping Board Emergency Fleet Corporation. The plaintiff was the consignee of more than 6,000 cases of onions which were expected to arrive in New York on or about February twenty-fourth on that vessel. In anticipation of its arrival the plaintiff together with a number of other consignees of similar goods

signed a written agreement addressed to this defendant which reads as follows:

" We, the undersigned, consignees of onions ex S. S. Lake Frio (in consideration of your engaging the heated pier 22, Brooklyn, for the discharge of its cargo of onions on receipt of this agreement) agree in the event that S. S. Lake Frio does not dock on or before February 24, 1920 as follows:

" We will pay you at the rate of $330 per day, beginning Tuesday, February 24, 1920, as the cost of said pier up to the date of her docking, upon this further condition and provision; namely, that when the said vessel docks, whether before or on or after February 24, 1920, the usual wharfage terms will prevail from the date of her docking; that is the charges to consignees for wharfage shall commence forty-eight (48) hours after the termination of the discharge.

" Should there be a charge to us under this agreement you are to pro rate the charge to us according to the quantity and size of the packages we severally have on this vessel."

The steamship arrived in New York on February twenty-seventh and on February twenty-eighth an officer of the plaintiff claims that he had a conversation over the telephone with some person who he believes was a Mr. Cohalane, the assistant of defendant's treasurer. At that time he told Mr. Cohalane " that the wharfage deposit that they demanded was entirely unreasonable and they told us *that the wharfage would only accrue forty-eight hours* after the complete discharge of the vessel and they would return whatever was coming to us." Thereafter the plaintiff sent the defendant a " wharfage deposit " of $780.99 stating in the letter in which the deposit was enclosed that it was made " under protest." After the cargo of the vessel was discharged the

defendant sent to the plaintiff a check for the sum of $442.36 with a statement showing that the plaintiff had been charged for wharfage and other expenses the difference between the amount of that check and the amount of plaintiff's deposit. The plaintiff refused to accept the check and brought this action to recover the full amount of the deposit.

It is not disputed that the plaintiff did remove from the wharf within forty-eight hours after the discharge of the vessel's cargo, all the cases consigned to it except possibly a few which were destroyed by the health department and the plaintiff claims that the defendant is bound by the agreement alleged to have been made through Mr. Cohalane and must, therefore, return the entire amount of the deposit made by it in advance for wharfage while the defendant claims that the plaintiff is bound by its own written agreement to pay for a heated wharf.

The defendant urges on this appeal that the evidence in regard to the telephone conversation was incompetent because the plaintiff did not recognize the voice of the man with whom the conversation was held; that even if the conversation was held with Cohalane, there is no evidence that he had authority to modify or abrogate the plaintiff's written agreement to pay his *pro rata* share for a heated wharf from February twenty-fourth to the arrival of the steamship and finally, that even if Cohalane had such authority, the conversation is insufficient to show an actual modification. It seems to me unnecessary upon this appeal to determine whether the identification of Mr. Cohalane was sufficient to permit evidence of the telephone conversation, for in my opinion there is no evidence to show either that Mr. Cohalane had authority to modify the written contract or that he intended to do so. If the written con-

tract was valid and enforcible, then the conversation with Mr. Cohalane amounted to nothing more than a statement that the amount demanded as a deposit for wharfage was tentative, that no wharfage would accrue from the date of the arrival of the vessel until forty-eight hours after the discharge of the cargo and if the cases consigned to the plaintiff were removed within forty-eight hours after the discharge of the cargo, then the defendant would not retain the whole deposit. On the other hand, if the written contract is not valid then even if no conversation had ever been held as claimed by the plaintiff, the plaintiff would still be entitled to the return of the deposit, for the written instrument itself shows that in the absence of special contract, no wharfage can by custom be charged against the consignee who removes his goods within forty-eight hours after the cargo has been discharged.

The real question to be determined in this case is therefore whether the written contract is enforcible. It appears that at the time when this instrument was signed, the consignees of the onions on board the steamship were desirous that the cargo should be unloaded on a heated wharf where there would be no danger of the cold weather injuring the onions. There are only a few available wharfs in New York which can be heated and the defendant was not willing to rent a wharf in advance of the arrival of the steamship and there was a possibility that no wharf which could be heated would be available when the steamship arrived. For that reason the consignees entered into an agreement to pay the sum of $330 per day from February twenty-fourth till the date of the actual arrival of the steamship. In spite of the fact that the plaintiff acted upon the agreement the plaintiff now claims that the agreement was against public policy

and, therefore, unenforcible because a carrier is in any event bound to furnish a proper place for the landing of the cargo and has no right to demand from consignees extra payments to enable it to comply with its own obligation. The plaintiff's contention does not seem to me in accordance with either reason or authority. It is true that a carrier is under an obligation to use due care both in transporting and landing its cargo and it cannot by any contract absolve itself from this obligation. The contract between the parties does not, however, provide that the defendant shall not be liable for failure to use due care in carrying out its contract of carriage. It may be that if the cargo had arrived during cold weather it would have been negligence on the defendant's part to unload the onions on an unheated wharf without due notice to the consignees to remove the onions as they left the ship and possibly it might have been required to take precautions for the protection of goods that might be injured by cold but it was not bound to provide a heated wharf and if the consignees desired that such a wharf should be procured, the defendant had a right to enter into a contract with them to furnish such a wharf for additional compensation. The plaintiff is, therefore, bound by the terms of the agreement and since it appears that the ship did not arrive till three days after February twenty-fourth, the judgment in favor of the plaintiff for the full amount of the deposit is erroneous.

It does not follow, however, that the defendant was entitled to retain the amount deposited by the plaintiff with the exception of $442.36 which was tendered by the defendant, for the amount so retained includes not only the plaintiff's *pro rata* share of the agreed sum of $330 per day but also its *pro rata* share of a larger amount claimed to have been expended for

Appellate Term, First Department, December, 1921. [Vol. 117

heating the wharf and also expenses in sorting and transporting onions which it is claimed belonged to the plaintiff and which were destroyed by the board of health.

The evidence presented by the defendant to establish the last item was clearly insufficient. The only obligation on the part of the plaintiff which the defendant sufficiently proved was the obligation under the written contract and that is expressly limited to the plaintiff's *pro rata* share of $330 per day from February twenty-fourth to February twenty-seventh, the date of the arrival of the vessel.

Judgment should, therefore, be reversed and a new trial ordered, with thirty dollars costs to appellant to abide the event unless the plaintiff stipulates within ten days after entry of order herein to reduce the judgment by its *pro rata* share of $990, and if such stipulation is filed, the judgment as modified should be affirmed, without costs to either party.

WHITAKER and DELEHANTY, JJ., concur.

Judgment reversed.